Lillian **SCHLOTHAN**, Appellant,

v.

**TERRITORY OF ALASKA**, Appellee.

**TERRITORY OF ALASKA**, Appellant,

v.

Lillian **SCHLOTHAN**, Appellee.

No. 15817.

United States Court of Appeals
Ninth Circuit.

Feb. 9, 1960.

Phillip Barnett, San Francisco, Cal., Gore & Jernberg, Ketchikan, Alaska, for appellant.

J. Gerald Williams, Atty. Gen., David J. Pree, Asst. Atty. Gen., Territory of Alaska, for appellee.

Before CHAMBERS, Chief Judge, and STEPHENS, POPE, FEE, BARNES, HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

This mortgage foreclosure case presents questions concerning the priorities as between a statutory lien of the Territory of Alaska for unpaid license taxes and a purchase money mortgage. The trial court determined by summary judgment that the tax lien had priority as to some, but not all, of the unpaid taxes. The mortgagee has appealed, and Alaska has cross-appealed.

The facts are not in dispute. Prior to June 19, 1951, Lillian Schlothan was the owner of certain tideland and dock property in Ketchikan, Alaska. The property was then being used for storage and warehouse purposes and had never been used as a cannery. On the indicated date she sold this property to Sigmund Einstoss, executing a quitclaim deed and taking back a purchase money mortgage for the full purchase price of $25,000. The mortgage was duly recorded on June 28, 1951.

Einstoss was then and for some time had been engaged in the fishing and canning business throughout Alaska. Shortly after acquiring the Schlothan property, he converted it into a cannery and canned salmon there during the remainder of 1951. During this period, as before, he also canned salmon at other places in Alaska.

On November 2, 1953, Alaska filed a notice of tax lien against Einstoss in the office of the recorder for the precinct of Ketchikan. The lien, which is provided for by Sess.Laws Alaska (1949), chapter 82, § 4(h) as amended by Sess.Laws Alaska (1951), chapter 113, was to secure payment of license taxes upon Einstoss' salmon cannery operations throughout Alaska for 1950 and 1951.[1] At no time prior to the filing of this notice of tax lien did Lillian Schlothan or her agents know that unpaid cannery license taxes had accrued against Einstoss. Nor did she or her agents, prior to that time, have knowledge of any lien against Einstoss' property for unpaid taxes, or of any claim by Alaska against the property in question.

On March 29, 1954, at a time when $11,000 remained due on the purchase money mortgage, Einstoss defaulted on the terms of the mortgage. Lillian Schlothan then instituted this foreclosure proceeding. Einstoss died and Mildred

---

1. Section 4(h) of chapter 82, Sess.Laws Alaska (1949), as amended, under which the tax lien is asserted, reads as follows: "(h) Liens. All taxes levied or provided or accruing under the provisions of this Act, and the penalties and interest thereon, are hereby declared to be a lien prior, paramount and superior to all other liens, mortgages, hypothecations, conveyances and assignments, upon all the real and personal property of the person, firm or corporation liable therefor, and also upon all the real and personal property used with the permission of the owner thereof in prosecuting the business * * *."

Hulce was appointed administratrix of his estate.

Alaska intervened because of its claimed interest in the property under the tax lien notice of November 2, 1953. The territory filed a cross-complaint against Einstoss to recover the sum of $83,402.-47. Of this sum, $59,582.93 represents unpaid taxes for 1950 and 1951, $14,-895.73 represents penalties, and $8,923.-81 represents interest to May 1, 1954, and the cost of the lien notice. The territory also sought a decree foreclosing its lien with a declaration that it was prior and superior to any right, title, or interest of Lillian Schlothan in the property in question.

On December 13, 1956, the court, pursuant to a motion of Lillian Schlothan for judgment on the pleadings, entered a judgment in favor of her and against Einstoss in the sum of $14,800.12 and costs. Foreclosure of the mortgage was decreed. It was further provided that "this judgment does not attempt to decide whether the plaintiff's lien or the lien of the Territory is superior, and that question is left for further action by this Court."

On the same day the trial court granted a motion for a summary judgment filed by Alaska on November 26, 1956. In this judgment Alaska was awarded recovery against Einstoss in the amount of $83,402.47. It was also recited therein that Alaska's tax lien is "prior, paramount and superior to any right, title, claim, lien, or interest of the plaintiff in defendant, Sigmund Einstoss', property." It was further provided that the property be foreclosed and sold to satisfy the territory's lien.

This latter judgment establishing the lien priorities in favor of Alaska would appear to be the "further action" concerning priorities referred to in the other judgment of the same date. However, for reasons which are unexplained in the record, the parties and the trial court proceeded thereafter just as if this second judgment of December 13, 1956, had never been entered.

On December 20, 1956, counsel for Alaska appeared ex parte before the trial court and objected to the form of the judgment of December 13, 1956, which had been entered in favor of Lillian Schlothan. No reference was made to the other judgment of the same date in which the lien priorities were established in favor of Alaska. As a result of this hearing an order was entered on December 20, 1956, staying enforcement of the judgment in favor of Lillian Schlothan "pending the final determination of the interest of the Territory of Alaska in relation to all claims in this cause * * *."

On January 25, 1957, a stipulation of facts pertinent to the question of lien priorities was filed. On the same day Alaska's motion for summary judgment filed on November 26, 1956, came on for argument just as if it had not already been granted on December 13, 1956. No appearance was made or brief filed on behalf of Lillian Schlothan. The matter was taken under advisement and on June 21, 1957, an extensive but unreported written opinion was handed down by the trial court.

It was held that the lien for taxes which became due after Einstoss acquired the Schlothan property, computed on the basis of cannery operations anywhere in Alaska, had priority over the purchase money mortgage. It was further held that the purchase money mortgage had priority over the lien for taxes which became due before Einstoss acquired this property. This latter ruling was based on the trial court's view that it was not the intention of the legislature to impose a lien upon after-acquired property beyond the interest of the taxpayer therein.[2]

2. Taxes provided for under chapter 82, as amended, are not reportable and owing until January 15 of the succeeding year. See Sess.Laws Alaska (1949), chapter 82, § 3. The judgment which was entered, as described below, indicates that by the term "after-acquired" property the trial court meant property acquired after the tax became due and owing. Thus, Einstoss' acquisition of the Schlothan prop-

On October 31, 1957, a judgment was entered effectuating the decision announced in the written opinion. With regard to lien priorities it was provided that the tax lien had priority over the purchase money mortgage for all cannery license taxes accruing on Einstoss' Alaskan operations in 1951. These taxes, together with penalties and interest to October 15, 1957, totaled $59,628.46. Of this sum, $26,316.20 represented cannery operations at Ketchikan, but there was no allocation as between Einstoss' operations on the Schlothan property and his other operations in Ketchikan during that year. Of the remaining sum, $32,-971.82 represented 1951 cannery operations in Peterberg, Alaska, and $340.44 represented similar activities at Sitka, Alaska.

The judgment further provided that with regard to cannery licenses taxes accruing on Einstoss' 1950 operations the Schlothan purchase money mortgage had priority over the tax lien. The 1950 taxes, penalties, and interest (to October 15, 1957) thus subordinated to the mortgage aggregated $36,128.23.

In considering the appeal and cross-appeal we will assume that the second judgment of December 13, 1956, giving Alaska tax lien priority over the mortgage as to both 1950 and 1951 was improvidently entered and in effect vacated. We thus adopt the course which both parties and the trial court have followed in regarding the judgment and decree of October 31, 1957, as the only judgment establishing lien priorities.

Lillian Schlothan appeals from that part of this judgment which subordinates her mortgage to the tax lien for 1951 taxes. She presents a number of constitutional questions. She also contests the construction which the trial court placed upon the lien statute and the propriety of deciding the matter of lien priorities by summary judgment.

■ Turning to the constitutional questions, appellant points out that on June 19, 1951, when she sold the property to Einstoss, no tax returns had been filed by Einstoss and none were filed for him until the after her foreclosure action was begun. As she also notes, it was not until November 2, 1953, nearly two years after she had recorded her mortgage, that Alaska filed notice of its tax lien. It is her contention that lack of notice of such lien prior to June 19, 1951, when she dealt with the property, constitutes a violation of the due process clauses of the Fifth and Fourteenth Amendments.[3]

Chapter 82 does not refer to a specific date on which the lien for taxes resulting from cannery operations in a particular year is deemed to attach. However, in section 4 of that chapter it is stated that "all taxes levied or provided or accruing under the provisions of this Act * * * are hereby declared to be a lien * * *."

Chapter 82 taxes for 1951 did not accrue until January 15, 1952, when they were first reportable and owing. It may be that they were not levied until then or the later date of November 2, 1952, when the notice of lien for 1951 was filed.[4]

Such taxes, however, were "provided" for as of the first day of 1951 in which Einstoss engaged in cannery operations. He was required to obtain a license before beginning such activity, conditioned upon the payment of a tax measured by the value of raw fish obtained for canning "during the year." See section 1 of chapter 82. Thus, as Einstoss began

erty on June 19, 1951, was considered to be "after-acquired" with respect to 1950 taxes, which were due and owing on January 15, 1951. But it was not considered to be "after-acquired" with regard to any 1951 taxes, because none of the taxes for that year were due and owing until January 15, 1952.

3. The validity of Alaska territorial tax statutes must be judged by the same standards of due process and of equal protection that would be applied in the case of similar legislation by a state. Alaska Steamship Co. v. Mullaney, 9 Cir., 180 F.2d 805. See, also, Hess v. Mullaney, 9 Cir., 213 F.2d 635, 15 Alaska 40.

4. Section 1 of chapter 82, however, provides that "a license so to do on the basis of the following * * * taxes which *are hereby levied*:" (Emphasis supplied.)

acquiring raw fish in 1951 for use in his cannery operations that year he became liable for a tax which was reportable and became due at a later date.

It is therefore our view that an inchoate lien for 1951 taxes under chapter 82 attached to all property owned by Einstoss as of the first day of that year in which he engaged in the business of salmon canning. With regard to the property here in question, such inchoate lien attached on June 19, 1951, this being the date on which he became the owner of that property.

■ When Lillian Schlothan sold the property on that date and took back a mortgage, she was aware that Einstoss had engaged in cannery operations in Ketchikan earlier that year. She is also chargeable with knowing of the lien provisions of chapter 82. Hence, on June 19, 1951, Lillian Schlothan had constructive notice that when Einstoss acquired title to her property a paramount inchoate lien would immediately attach effective as to all chapter 82 taxes, based on Einstoss' 1951 salmon canning activities before and after that date. This notice was sufficient to meet the requirements of due process.[5]

Appellant argues further, however, that aside from the question of notice,

section 4(h) of chapter 82, as herein applied, is so unreasonable as to constitute an "affront to justice," and for this reason violates the due process clause.

The constitutional test appellant thus invokes was suggested by Mr. Justice Cardozo in Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439, and is quoted with approval in International Harvester Credit Corporation v. Goodrich, supra, 350 U.S. at page 547, 76 S.Ct. at page 627. Speaking of the boundaries of legislative power in the field of taxation, Mr. Justice Cardozo said: "The question is whether it [the concept reflected in the statute] is one that an enlightened legislator might act upon without affront to justice."

What affronts justice here, appellant tells us, is that the Alaska lien statute purports to impose a prior lien regardless of whether the tax was incurred in the use of the particular property against which the lien is asserted, or was incurred in connection with the use of other property anywhere in Alaska.[6]

As stated above, a proposed encumbrancer is chargeable with notice of an existing statute giving priority to a tax lien based on business activities conducted on other property. He may nevertheless, and quite understandably, fail to realize the full destructive effect such a

5. See United States v. State of Alabama, 313 U.S. 274, 280, 61 S.Ct. 1011, 85 L. Ed. 1327; Minneapolis Threshing Machine Co. v. Roberts County, 34 S.D. 498, 149 N.W. 163, L.R.A.1915D, 886. See, also, Anderson National Bank v. Luckett, 321 U.S. 233, 243, 64 S.Ct. 599, 88 L.Ed. 692. It has recently been held, in fact, that the lack of notice of lien is constitutionally unobjectionable even though some of the taxes were due and owing in the year before the conditional sales vendor without notice sold the property which was made subject to the lien. International Harvester Credit Corporation v. Goodrich, 350 U.S. 537, 76 S.Ct. 621, 100 L.Ed. 681. The judgment under review in our case did not give lien priority as to taxes which were due prior to the Schlothan property transaction. Hence, the reach of the International Harvester decision with regard to notice goes beyond what is necessary to decide the notice question in the instant case.

6. That this is a correct interpretation of the statute and is in fact the way it has been applied here is indicated by the facts set out above. With regard to the 1951 taxes, penalties, and interest given lien priority by the judgment under review, $33,312.26 resulted from business activities outside of Ketchikan where the Schlothan property is located. There has been no allocation of the remaining $26,-316.20 in 1951 taxes, penalties, and interest which were given priority, as between business activity conducted on the Schlothan property after June 19, 1951, and business activity conducted elsewhere in Ketchikan during that year. During the early part of 1951, Einstoss conducted a cannery operation on the Bertosen property in Ketchikan. In April of that year the cannery located on that property burned down.

provision may have upon the security. If he does have that realization in advance of making the loan, he may conclude that the only safe course is to refuse the loan. A general reticence to loan money on mortgage security arising from such considerations would tend to undermine the value of property for hypothecation. Thus a statute containing such a provision may work out harshly for both mortgagor and mortgagee. It unquestionably works out harshly for at least the mortgagee in this case.

The actual or potential harshness of such a lien-priority provision has been judicially recognized in many cases. The result of such recognition, however, has not been to declare the statute unconstitutional, but to construe the statute in such a way that the constitutional question is avoided. Thus, where the statute does not in express terms extend the lien priority to include taxes arising from business activity or ad valorem assessments on other property, it has uniformly been held that no such extension was intended by the legislature.[7]

■ Here, however, the constitutional question must be dealt with. The Alaska statute explicitly makes a license tax lien prior, paramount, and superior "to all other liens, mortgages, hypothecations, conveyances and assignments, upon all the real and personal property of the person * * * liable therefor * * *."

On the authority of International Harvester Credit Corporation v. Goodrich, 350 U.S. 537, 76 S.Ct. 621, 626, 100 L.Ed. 681, the constitutionality of such a statute challenged on the ground of unreasonableness must be upheld. In that case the Cardozo test of constitutional reasonableness laid down in Burnet v. Wells, supra, was quoted and found to have been met. Specifically, it was held that a statute which gave tax lien priority over conditional sales contracts on three trucks, with regard to a highway use tax meas-

ured by the operation of the carrier's entire fleet, is not violative of the due process clause on the ground of unreasonableness.

Appellant argues that International Harvester is to be distinguished from the instant case because the tax there in question, unlike the Alaska tax, was imposed for the purpose of compensating the state for the use of the highways. The court there pointed out that the burden placed on the highways by the operation of the trucks which were subject to the conditional sales contracts "has been precisely the same as though the carrier had held unencumbered title to the trucks."

In our opinion, however, the circumstance just mentioned does not adequately distinguish International Harvester from the case before us. The New York highway use tax involved in International Harvester was computed on a graduated scale beginning at six mills per mile for vehicles of between 18,001 and 20,000 pounds. Thus it would have been practicable to compute the tax arising from the operation of each truck, and indeed this may have been the practice. This being so, the fact that the operation of a truck encumbered by a conditional sales contract is as hard on the highways as an unencumbered truck would not seem to be a good reason for saddling the former with tax liens arising from the operation of the latter.

It was emphasized in International Harvester that the lien-priority statute there in question was enacted for the purpose of meeting a practical tax-collecting problem. The court closed its opinion with these words, " * * * the tax is owed by the carrier and the need for an effective lien to enforce it is all the more necessary where, as here, the tax cannot be computed or readily collected in advance." The same underlying consideration semed to have dictated the conclusion reached in the Minneapolis

---

7. See Scottish American Mortgage Co. v. Minidoka County, 47 Idaho 33, 272 P. 498, 65 A.L.R. 663, and cases therein collected, dealing with an analogous statutory provision assertedly imposing a personal property tax lien upon the taxpayer's real property, with priority over pre-existing encumbrances on the latter property.

Threshing Machine Co. case, supra [34 S.D. 498, 149 N.W. 164]. The court there said:

"It is essential, in order that the state may collect its revenue and carry on the public business, to make such a tax a paramount lien * * *."

■ We take judicial notice of the great importance of the salmon canning industry in Alaska as compared to many other industries concerning which territorial license tax liens may or may not have been provided for. Alaska here asserts and appellant does not deny that license taxes assessed against salmon canners are difficult to collect because the business is seasonal, substantial taxes may accrue in a brief period, many canneries operate on very little capital, and the business is to a considerable extent itinerant.

Thus essentially the same primary considerations which led the Supreme Court in International Harvester, and the South Dakota Supreme Court in Minneapolis Threshing Machine, to uphold the lien-priority statutes there in question are present here.

In the latter case and in State v. Wynne, 134 Tex. 455, 133 S.W.2d 951, the view is expressed that if a lien-priority statute seems unjust and needs amending the remedy should come from the legislature. This is just what has taken place in New York following the decision in International Harvester, and in Kansas following the decision in Freuhauf Trailer Co. v. State Corporation Commission, 149 Kan. 465, 87 P.2d 641.[8] At the trial court hearing the assistant attorney general of the Territory of Alaska expressed the hope of his office that the legislature of Alaska would amend

the law to delete this harsh provision. The legislature also has it within its power, if it wishes to do so, to return to Mrs. Schlothan the sums collected at the expense of her mortgage.

■ We conclude that imposition of tax lien priority over the Schlothan purchase money mortgage as to taxes measured by Einstoss' 1951 operations throughout Alaska is not such an affront to justice that it must be set aside by virtue of the due process clauses of the Fifth and Fourteenth Amendments.

■ Appellant also attacks the constitutionality of Sess.Laws Alaska (1949), chapter 82, § 4(h), as given effect in the judgment under review, on the ground that it denies to her the equal protection of the laws. Here again, attention is drawn to the fact that the statute subjects contract encumbrancers to a prior lien for taxes measured by cannery operations conducted on property other than that which is encumbered. It is asserted that persons who hold security interests in property owned by individuals not engaged in the fishing industry are not subjected to a comparable lien priority. Accordingly, it is argued, persons in the position of Lillian Schlothan are placed in an unreasonable and burdensome classification not imposed upon other persons who hold security interests with respect to property not owned by individuals engaged in the fishing industry.

A substantially similar contention was advanced in State ex rel. Veatch v. Franklin, 163 Or. 500, 98 P.2d 724, 726. The statute there in question required that poundage fees be paid on smelt, crabs, clams, oysters, salmon, and other anadromous fish. No statutory lien to secure the payment of such fees was pro-

---

8. McKinney's N.Y.Consol.Laws, c. 60, Tax Law, § 506, which was the lien-priority statute upheld in the International Harvester case, was amended, effective September 1, 1957 (L.1957, c. 649, § 1) to provide that, subject to certain conditions not material here, the lien of the highway use tax "shall be subject to the lien of any indebtedness secured by a chattel mortgage or conditional sales agreement existing against such motor vehicle or vehicular unit previous to the time when such tax lien became a lien * * *." The Kansas lien-priority statute, G.S. 1935, 66-1, 120 et seq. which was upheld in Freuhauf Trailer Co. v. State Corporation Commission, supra, was later repealed. Kan.Laws 1955, c. 294.

vided for, however, except in the case of salmon and other anadromous fish. Creditors of a cannery operator whose judgment liens against his property were subordinated to the lien for poundage fees challenged the constitutionality of the lien provision. They argued that as persons who dealt with and extended credit to the salmon canner they were discriminated against in favor of those who extended credit to persons in the other classes and who are not subjected to the hazards of the state's lien.

Disposing of this contention, the supreme court of Oregon said:

"It is sufficient answer to these claims, assuming that a lien creditor has any standing to assert them, to say that legislation which affects alike all persons pursuing the same business under the same conditions is not such class legislation as is prohibited. Savage v. Martin, 161 Or. 660, 91 P.2d 273, 287. The legislative discretion in such matters will not be disturbed by the courts unless the classification is plainly and manifestly arbitrary and without any reasonable basis. Here, the comparatively great importance in this state of the anadromous fish industry would justify the legislative decision to authorize a lien in the one case and not in the other. See 12 Am.Jur., 'Constitutional Law', 164, § 485."

Not only is this a sound statement of the controlling principle, but the factual considerations which led to rejection of the equal protection argument in that case are closely paralleled by the facts before us here. In our opinion, the fact that Alaska has not imposed a lien to secure unpaid license fees on other businesses does not deny a creditor of a salmon canner equal protection of the laws.

As her final constitutional argument, appellant urges that Sess.Laws Alaska (1949), chapter 82, § 4(h), imposing the lien priority here in question impairs contracts such as her purchase money mortgage, in violation of Art. I, § 10, of the Constitution.

The clause of Art. I, § 10, of the Constitution, forbidding the passage of laws impairing the obligation of contract, has reference only to a state law enacted after the making of the contract whose obligation is asserted to have been impaired. Oshkosh Waterworks Co. v. City of Oshkosh, 187 U.S. 437, 446, 23 S.Ct. 234, 47 L.Ed. 249.

Chapter 82 was enacted and became effective in 1949. It was amended by Sess.Laws Alaska (1951), chapter 113, which became effective March 24, 1951. Lillian Schlothan's mortgage was executed June 19, 1951. The obligations of this mortgage were therefore not impaired by the lien statutes in question but were entered into subject to those statutes. See Abilene National Bank v. Dolley, 228 U.S. 1, 5, 33 S.Ct. 409, 57 L.Ed. 707.

In appellant's specifications of error, but nowhere else in her brief, it is asserted that, properly construed, the lien statutes under discussion apply only with respect to the taxpayer's equity in the property subjected to the lien. If the statutes were given this interpretation, Lillian Schlothan's interest, represented by the unpaid portion of her mortgage, would not be subordinated to the tax lien.

Chapter 82, § 4(h), imposing the lien, makes it applicable "upon all the real and personal property of the person * * * liable therefor * * *." Appellant would apparently change this to read "upon the taxpayer's equity in all the real and personal property of the person * * * liable therefor." But this construction is negated by preceding language in the same section specifying that such lien shall be "prior, paramount and superior to all other liens, mortgages, hypothecations, conveyances and assignments * * *." Hence, it is the total value of the property and not just the taxpayer's equity therein which is intended to be reached by the lien imposed by section 4(h).

Finally, appellant argues, this case should not have been disposed of by sum-

mary judgment because in her view there are genuine issues as to material facts.

Under Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A., a summary judgment may not be entered if the pleadings, depositions, admissions, and affidavits on file show that there is a genuine issue as to any material fact.

Appellant asserts that there are genuine issues of fact as to the amount of taxes which are attributable to cannery operations on the Schlothan property as distinguished from Einstoss' other properties in Alaska. But these are not material facts. Under the view we take of the case, as stated above, the tax lien has priority over the Schlothan mortgage with regard to taxes measured by Einstoss' 1951 cannery operations anywhere in Alaska.

It is further contended that there is a genuine issue of fact as to the intention of the territorial legislature in passing the statute in question. In this connection appellant asserts that she was denied the right to subpoena committee members of the territorial legislature who drafted the legislation, and to produce legislative notes and discourse concerning the legislation.

█ The interpretation of a statute presents a question of law. Under certain circumstances the court may seek aid in deciding this question by examining legislative history. The testimony of legislators given subsequent to the enactment is not legislative history. 2 Sutherland Statutory Construction, 3d ed., 505, § 5013.

Legislative notes and discourse during the progress of legislative deliberation is legislative history in the broad sense if published and available to the public. Private notes and conversations, however, have no higher standing than subsequent testimony. Appellant does not contend that there are any published and available legislative notes and discourse. Nor does she deny Alaska's assertion that legislative notes and minutes of subcommittees are nonexistent in Alaska. But even were such materials available, they could not appropriately be produced as evidence in the trial, but only as appendices or supplements to briefs.

In our opinion appellant has failed to establish that there were any genuine issues as to material facts which precluded disposition of this case by summary judgment.

We turn now to Alaska's cross-appeal. As previously noted, the judgment, while giving Alaska's tax lien priority over the Schlothan mortgage with regard to 1951 taxes, subordinated the lien to that mortgage with regard to 1950 taxes.

The trial court found no constitutional impediment to the imposition of tax lien priority with regard to taxes for the year prior to the time Lillian Schlothan sold her property and took a mortgage. But it held that the legislature, in enacting Sess.Laws Alaska, chapter 82, did not intend to impose a lien upon after-acquired property beyond the interest of the taxpayer therein. Alaska asks us to reverse the trial court in this regard and to subordinate the Schlothan property to the tax lien for 1950 taxes as well as 1951 taxes.

█ The 1951 taxes, penalties, and interest for which Alaska was given priority amounted to $59,628.46 as of October 15, 1957. This far exceeds the value of the Schlothan property. It follows, as counsel for Alaska conceded on oral argument, that if Alaska prevails on the cross-appeal it will not receive one dollar more than it will obtain under the present judgment. Accordingly, it is not aggrieved by the judgment and has no standing to cross-appeal.

The cross-appeal is dismissed. The judgment is affirmed.

After this case was submitted en banc, the death of Circuit Judge JAMES ALGER FEE occurred on August 25, 1959.